STATE of Wisconsin, Plaintiff-Appellant,

v.

Leonard J. QUINTANA, Defendant-Respondent.†

Court of Appeals

*No. 2006AP499–CR. Submitted on briefs November 20, 2006.
—Decided January 17, 2007.*

2007 WI App 29

(Also reported in 729 N.W.2d 776.)

† Petition to review filed.

235

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Peggy A. Lautenschlager*, attorney general, and *Christopher G. Wren*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James B. Connell* of *Crooks, Low & Connell, S.C.*, Wausau.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. HOOVER, P.J. The State of Wisconsin appeals an order dismissing a mayhem charge and school zone penalty enhancers attached to two charges against Leonard Quintana. The court concluded that the mayhem statute does not apply to injuries to the forehead and it held the school zone enhancer was unconstitutional as applied to Quintana. We conclude that the mayhem statute applies here and, further, we conclude that the school zone enhancer is not unconstitutional. Accordingly, we reverse the court's order and remand the case for further proceedings.

## Background

¶ 2. In the early morning hours of September 4, 2004, Quintana allegedly entered the bedroom of his ex-wife Shannon and struck her forehead with the claw end of a hammer approximately three times. A neurosurgeon who examined Shannon following the attack

described her injuries. She suffered a skull fracture and a scalp laceration running from above her eyebrow to behind her ear. As a result of the skull fracture, small pieces of bone tore the brain lining, allowing spinal fluid to leak into the wound. Shannon also sustained an intracranial injury with air and blood in the brain, an injury that "carries a potential for dying from it." Shannon further suffers from recurrent headaches and memory deficits.

¶ 3. The initial criminal complaint changed Quintana with attempted first-degree intentional homicide with domestic violence and dangerous weapon enhancers. The complaint was amended twice and the State then filed an Information, later amending that document as well. The amended information, filed November 23, 2005, charged Quintana with solicitation of first-degree intentional homicide and added three new charges: first-degree reckless injury, aggravated battery, and mayhem. The three new charges were each alleged to be acts of domestic abuse and committed with a dangerous weapon. The mayhem and aggravated battery charges were alleged to have been committed in a school zone.

¶ 4. Quintana moved to dismiss the mayhem charge, claiming it was not supported by the evidence at the preliminary examination. He also asked to have the school zone penalty enhancers dropped, arguing the enhancer statute violates both equal protection and due process. The court agreed with Quintana, dismissing the mayhem charge because it concluded the statute is inapplicable to forehead injuries and dismissing the school zone enhancers because it concluded the statute was unconstitutional as applied.

## Discussion

## I. Mayhem

¶ 5. WISCONSIN STAT. § 940.21 states, "Whoever, with intent to disable or disfigure another, cuts or mutilates the tongue, eye, ear, nose, lip, limb or other bodily member of another is guilty of a Class C felony."[1] Quintana argued to the circuit court, and repeats on appeal, that the forehead is not an "other bodily member" under the statute. The court agreed, holding that because the term "other bodily member" "is preceded by a list of specific bodily members, many of which are on or in the head, its interpretation is limited to other bodily members similar to those specified." The court considered the bones and skin of the forehead to be present throughout the body and not at all unique like the other enumerated body parts in the statute.

¶ 6. Statutory construction is a question of law we review de novo. *Citizens' Utility Bd. v. Public Serv. Comm'n*, 2003 WI App 206, ¶ 8, 267 Wis. 2d 414, 671 N.W.2d 11. Our goal in statutory interpretation is to ascertain legislative intent and give it effect. *Id.* Here, the question is whether the forehead constitutes an "other bodily member" for purposes of the mayhem statute.

¶ 7. Both Quintana and the State agree that the mayhem statute has its origins in English common law, designed to preserve the fitness of the sovereign's citizens for military service. They both also seem to agree that modern usage of the statute serves to preserve the normal function or appearance of the human

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

240

body, with no emphasis on conscription, self-defense, or other form of combat. The parties diverge, however, on the application of the statute to these facts and both proffer problematic interpretations.

¶ 8. Quintana would have us apply the doctrine of *ejusdem generis* and convinced the circuit court to do so. Under this doctrine, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." BLACK'S LAW DICTIONARY 556 (8th ed. 2004). BLACK'S gives an example: "in the phrase *horses, cattle, sheep, pigs, goats, or any other farm animal,* the general language *or any other farm animal*—despite its seeming breadth—would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens." *Id.* (emphasis in original). Thus, in Quintana's interpretation and the circuit court's decision, the forehead is not like the other enumerated parts of the head and therefore is not an "other bodily member."

¶ 9. Here, however, application of the doctrine is imperfect, because the statute also includes "limb" in the list preceding "other bodily member." A limb—defined as an arm or a leg when talking about humans[2]—is distinct from any part of the head, and we thus reject the notion that the *ejusdem generis* doctrine requires an "other bodily member" to necessarily be like the tongue, eye, ear, nose, or lip. Indeed, if we followed Quintana's interpretation, it would be akin to putting the chickens back on Black's farm and still holding "any other farm animal" includes only four-legged hoofed mammals.

___

[2] *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1311 (unabr. 1993).

¶ 10. Quintana would also have us apply the doctrine of *noscitur a sociis,* meaning that a word or phrase is known from its associates. But as with the previous doctrine, it is difficult to interpret "other bodily member" based on its associates because a limb is unlike the other enumerated body parts.

¶ 11. The difficulty with Quintana and the circuit court's interpretation is its narrowness. If we limit "other bodily member" to "bodily members similar to those specified," we are not certain what would constitute an "other bodily member." The tongue, eyes, ears, nose, lips, and limbs really have no analogous parts elsewhere on the body. Yet the legislature must have intended the mayhem statute to apply to *some* other parts, or it would not have included "other bodily member" in the statute. When we construe statutes, we seek to avoid rendering parts meaningless surplusage. *Mueller v. McMillian Warner Ins. Co.,* 2006 WI 54, ¶ 27, 290 Wis. 2d 571, 714 N.W.2d 183.

¶ 12. To counter Quintana, the State contends the real question is whether the entire head, not just the forehead, is an "other bodily member." It points us to two cases to aid our statutory interpretation. The more recent of these is a California case, *People v. Newble,* 174 Cal. Rptr. 637 (Cal. App. 1981). In *Newble,* the question was also whether the head was a "member" of the body for purposes of a mayhem statute. There, the victim sustained a laceration extending from the left ear to the chin.

¶ 13. The California mayhem statute provided that "[e]very person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." *Id.* at 639. The *Newble*

242

court, after some discussion of statutory construction canons and review of the English common law, ultimately concluded the head was a "member" of the body, because

> [i]n light of the stated rationale of the crime of mayhem we conclude there is no tenable reason for distinguishing prominent facial wounds to a nose, ear or lip, from comparable wounds which happen to miss one of those areas of the head specifically mentioned in [the statute]. The opposite conclusion would lead to a result which is undesirable, if not absurd.

*Id.* at 640.

¶ 14. The State's reliance on *Newble*, however, suffers a similar but opposite problem as Quintana's reliance on interpretation doctrines. Although *Newble* is temptingly persuasive, it is overbroad. An interpretation of "other bodily member" that includes the entire head renders the legislative enumeration of the head's parts meaningless.

¶ 15. But the State also points us to an older Wisconsin case, *Moore v. State*, 3 Pin. 373 (1851), to demonstrate that "other bodily member" has been broadly interpreted in the past and should be broadly interpreted now. The facts of *Moore* are extremely abbreviated, but the supreme court applied the mayhem statute to the body's organs and held "[o]ur legislature certainly gave the same protection to the internal organs of the female [specifically, the uterus,] that it did to the external organs of the male." *Id.* at 375.[3] The

---

[3] The applicable mayhem statute, Wis. Rev. Stat. Ch. 133, § 31 (1849), read as follows:

> If any person, with malicious intent, to maim or disfigure, shall cut out or maim the tongue, put out or destroy an eye, cut or tear off

State suggests *Moore* indicates we should not adopt a narrow interpretation of the modern mayhem statute.

■

¶ 16. In an attempt to distinguish *Moore,* Quintana concedes that an internal organ is an "other bodily member." Indeed, Quintana makes a point of defining the nose as containing "the organs of smell" and the ear as "the organ of hearing" while explaining that the forehead does not fulfill the dictates of *Moore*. However, it is precisely this organ analogy that allows us to conclude the forehead, but not the entire head, can be considered an "other bodily member" under the statute.

■

¶ 17. The integral, operative parts of the nose and ear are internal to the skull—the exterior parts on the face that might be cut or maimed are simply cartilage and flesh. However, those exterior cosmetic components house and protect organ systems. If one wanted to "disable" the organs of hearing or smell, their location is conveniently marked by facial features, and attacking those features also serves to "disfigure." *See* WIS. STAT. § 940.21. Similarly, the forehead is skin and bone protecting parts of the brain, a critical organ. An attack to the forehead threatens to disable the internal organ beneath. Indeed, Shannon suffered multiple brain injuries. By contrast, the injury in *Newble*—a laceration to the jaw line—or a cut to the cheek are, as examples, arguably not adequate bases for a mayhem charge in this state.[4] Because we hold the mayhem statute covers

an ear, cut or slit or mutilate the nose or lip, or cut off or disable a limb or member of any person, every such offender . . . shall be punished by imprisonment . . . .

[4] In our estimation, this interpretation is consistent with both the common law and modern usage of the statute, and it

cutting or mutilation to the forehead, the mayhem charge should not have been dismissed.

## II. Constitutionality of School Zone Enhancer

¶ 18. Quintana challenges the constitutionality of the school zone enhancer, Wis. Stat. § 939.632, as applied to him. He raises both a due process and an equal protection challenge against the statute. He asserts the enhancer impermissibly distinguishes between those who live within 1,000 feet of a school and those who do not.

¶ 19. The constitutionality of a statute is a question of law we review without deference to the circuit court. *State v. Radke*, 2003 WI 7, ¶ 11, 259 Wis. 2d 13, 657 N.W.2d 66; *State v. Joseph E.G.*, 2001 WI App 29, ¶ 4, 240 Wis. 2d 481, 623 N.W.2d 137. Statutes are presumed constitutional and the challenger bears the burden of proving the statute's unconstitutionality beyond a reasonable doubt. *Joseph E.G.*, 240 Wis. 2d 481, ¶ 5. We indulge every presumption favoring constitutionality and if any doubt exists, it is resolved in favor of upholding the statute. *State v. McManus*, 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989). We will sustain a statute if there is any reasonable basis for it. *Radke*, 259 Wis. 2d 13, ¶ 11. Because Quintana raises an as-applied challenge, he must show the statute is unconstitutional as it applies to him. *Joseph E.G.*, 240 Wis. 2d 481, ¶ 5.

gives meaning to the phrase "other bodily member" without being too broad or too narrow. We are uncertain as to why the legislature chose to enumerate specific parts of the head, although we suspect the statutory wording is a carryover from the common law and prior statutes. Thus, we invite the legislature to re-examine the wording of the mayhem statute if it disagrees with our interpretation here.

¶ 20. "When a statute is challenged on equal protection grounds, we first must determine the level of judicial scrutiny" required. *State v. Smet*, 2005 WI App 263, ¶ 21, 288 Wis. 2d 525, 709 N.W.2d 474. If the legislature's classification interferes with the exercise of a fundamental right or disadvantages a suspect class, we review the statute with strict scrutiny. *Id.* Quintana does not claim the classification interferes with a fundamental right, nor does he claim a suspect class has been disadvantaged. Therefore, we apply a rational basis test to his equal protection claim. *Id.* Under this test, equal protection is violated if a classification rests on grounds wholly irrelevant to the achievement of the State's objectives. *Id.* That is, there must be reasonable and practical grounds for the legislative classifications, *McManus*, 152 Wis. 2d at 130, and the classifications may not be arbitrary or unreasonable. *Joseph E.G.*, 240 Wis. 2d 481, ¶ 8.

¶ 21. Similarly, due process "requires that the means chosen by the legislature bear a reasonable and rational relationship to the purpose or object of the enactment . . . ." *McManus*, 152 Wis. 2d at 130. Substantive due process protects against State conduct that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty. *Joseph E.G.*, 240 Wis. 2d 481, ¶ 13.

¶ 22. Quintana asserts the 1,000–foot classification is arbitrary and irrational under both equal protection and due process. He stresses that he was inside a residence, in the early morning hours, on a holiday weekend, and it was therefore highly unlikely children would be nearby.

¶ 23. In *State v. Hermann*, 164 Wis. 2d 269, 474 N.W.2d 906 (Ct. App. 1991), we dealt with the constitutionality of a school zone enhancer as applied to illegal drug transactions, as set forth in the Uniform Controlled Substances Act. That act contained a 1,000-foot zone that Hermann had argued was arbitrary and irrational. *Id.* at 283. We concluded the enhancer was not unconstitutional because

> [Under equal protection, t]he legislative classification in the statute is rationally related to the deterrence of illegal drug transactions near schools and other places children frequent. As we have stated, even if illegal drug transactions do not directly involve children, such illegality does contribute directly to a violent and dangerous atmosphere. Seeking to eliminate such an atmosphere near our schools by more harshly penalizing those who contribute to it is not patently arbitrary or irrational.
>
> . . . .
>
> [Under due process,] the means chosen—enhanced penalties for those convicted of drug transactions near school grounds—bear a reasonable and rational relationship to the deterrence of such activities. Whether or not children are directly involved is irrelevant. Thus, the fact proved (the proximity to school premises) is rationally related to the ultimate fact presumed (particular harm to children).

*Id.* at 284–85. Quintana appears to concede that at least when it comes to drugs, as in *Hermann*, a school zone enhancer has a legitimate, constitutional purpose. But Quintana asserts his acts are not the same as illegal drug transactions. Further, he questions how domestic violence impacts children in the same manner as drug crimes. The circuit court evidently wondered the same

thing, concluding domestic violence is not likely to involve children in the same way a drug transaction might.

¶ 24. First, the domestic violence "charges" in this case did not relate to stand-alone crimes. Rather, the State sought to add the domestic abuse surcharge under WIS. STAT. § 973.055. Quintana's alleged crimes are solicitation of homicide, mayhem, aggravated battery, and reckless injury, and the school zone enhancer may be applied to the mayhem and aggravated battery charges. The question is therefore not, as the trial court appeared to frame the issue, whether domestic violence might influence children, even though we suspect it often does. Rather, the question is whether the school zone enhancer is meant to protect children from the adverse impacts of the mayhem and aggravated battery charges and whether there is a reasonable basis for such a statute.

¶ 25. We think the protective intent is self-evident. Indeed, the statute in question here is titled "Penalties; violent crime in a school zone."[5] Second, as to the presence of children, *Hermann* noted the actual participation of children is irrelevant and concluded "the fact proved (the proximity to school premises) is rationally related to the ultimate fact presumed (particular harm to children)." *Hermann*, 164 Wis. 2d at 285. Even under *Hermann*, there are circumstances where a defendant might assert his actions do not detract from the safety of the zone, because not every

---

[5] *See* WIS. STAT. § 939.632; *see also Pure Milk Prods. Coop. v. National Farmers Org.*, 64 Wis. 2d 241, 253, 219 N.W.2d 564 (1974) ("Although the title is not part of the statute it may be persuasive of the interpretation to be given the statute."); *and see* WIS. STAT. § 939.632(1)(e) (specifying what constitutes a "violent crime" to which enhancer may be applied).

drug transaction will be "violent and dangerous," nor would every transaction necessarily have any impact on children.

¶ 26. But it is evident that through the school zone enhancer, the legislature meant to create a zone where, regardless of time of day or calendar date, the public can consider children safe and protected. The enhancer serves to deter crimes with the most serious adverse impacts on the atmosphere surrounding schools.

¶ 27. If we can imagine facts where the legislative classification passes constitutional muster, we may uphold the statute even if the legislature did not specifically articulate those particular justifications. *See Smet,* 288 Wis. 2d 525, ¶ 21. The State offers multiple plausible reasons supporting the constitutionality of WIS. STAT. § 939.632 as applied to Quintana. For example,

> Because of age, size, life experience, and mental and emotional development, school-age children run greater risks from violent crime than do adults.
>
> School-age children congregate in and around schools during the school day. Because of physical amenities and program opportunities at schools, school-age children also often congregate in and around schools at other times, including holidays, weekends, and vacation periods . . . .
>
> . . . .
>
> The closer a location to a school, the greater the likelihood of an increased concentration of children.
>
> One thousand feet from a school's premises establishes a boundary at which the concentration of children will

likely have declined to a level where the enhanced risk of violence will have dissipated to a point of ordinary risk.

. . . .

Violent criminal conduct that originates within a residence between related individuals can spill over into public areas traversed by children. . . . Moreover, heightened emotions in disputes between related individuals can increase the risk of escalating violence. . . . Efforts of persons in the residence to escape can drag the violence outside the residence and place others at significant risk.

¶ 28. To this, we would also suggest that when children learn of violent crime—as they often do, through television, the Internet, observation, or gossip —they begin to wonder whether something similar could happen to them or their family and friends. Unlike when the reference is to violence in another part of the country or the world, children's preoccupation and worry is no doubt magnified when a violent event happens in an area with which they familiar, such as their school, because their ability to visualize the area makes the threat more concrete to them.

¶ 29. These are logical, rational, reasonable bases for a penalty enhancer meant to deter violent crime near schools. One thousand feet is a practical, uniform boundary for enforcement purposes. WISCONSIN STAT. § 939.632 is constitutional as applied; the enhancers should not have been dismissed.

*By the Court.*—Order reversed and cause remanded for further proceedings.