STATE of Wisconsin, Plaintiff-Appellant,

v.

Leonard J. QUINTANA,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2006AP499–CR. Oral argument October 31, 2007.
—Decided May 1, 2008.*

2008 WI 33

(Also reported in 748 N.W.2d 447.)

617

For the defendant-respondent-petitioner there were briefs by *James B. Connell, Robyn J. DeVos,* and *Crooks, Low & Connell, S.C.,* Wausau, and oral argument by *William R. Kerner, William Robert Kerner Law Office,* Milwaukee.

For the plaintiff-appellant there was oral argument by *Christopher G. Wren,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals,[1] which reversed and remanded the decision of the Marathon County Circuit Court, Vincent K. Howard, Judge. The circuit court concluded that the forehead does not qualify as an "other bodily member" under Wisconsin's mayhem statute, Wis. Stat. § 940.21 (2003–04),[2] and it concluded that the violent crime in a school zone penalty enhancer, Wis. Stat. § 939.632, was unconstitutional as applied to Quintana. The court of appeals reversed and remanded, and Quintana petitioned this court for review. We affirm the court of appeals' decision.

¶ 2. This appeal presents the following two issues: First, we must decide whether the forehead qualifies as an "other bodily member" under Wisconsin's mayhem statute. We conclude that the forehead qualifies as an "other bodily member" under Wis. Stat. § 940.21, Mayhem. Wisconsin's mayhem statute seeks to punish those who intentionally disable or disfigure another person's bodily member. The manner in which the legislature used the phrase, "other bodily member," requires that we give that phrase a broad construction. If "other bodily member" were to be narrowly construed, the construction would produce absurd results, and the

---

[1] *State v. Quintana,* 2007 WI App 29, 299 Wis. 2d 234, 729 N.W.2d 776.

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted, which frequently occurs throughout this opinion.

purpose of the statute would easily be defeated. Because the legislature intended the phrase "other bodily member" to be construed broadly rather than narrowly, the phrase "other bodily member" in the mayhem statute encompasses all bodily parts, including a person's forehead. The application of the mayhem statute is limited by the need to prove that a person specifically intended to disable or disfigure.

¶ 3. Second, we must decide whether the violent crime in a school zone penalty enhancer[3] is unconstitutional as applied to Quintana. We conclude that the violent crime in a school zone penalty enhancer is not unconstitutional as applied to Quintana. The legislature seeks to deter violent crime near schools in an effort to create a safety zone around schools. The 1,000–foot perimeter is a reasonable distance to try to accomplish this legislative goal. Quintana has failed to show that the penalty enhancer is unconstitutional beyond a reasonable doubt.

## I. FACTS

¶ 4. At approximately four o'clock in the morning on September 4, 2004, Leonard Quintana allegedly entered the bedroom of his sleeping ex-wife, Shannon Quintana, and struck her on the head with a hammer. Police officers who responded to the scene described Shannon's head and hair as covered in blood, and they described a large amount of blood located at the head of the bed. Additionally, police officers stated that the walls, window shades, and dresser were spattered with blood.

¶ 5. The neurosurgeon who treated Shannon, Dr. Dennis Mollman, testified at Quintana's preliminary

---

[3] Wisconsin Stat. § 939.632.

hearing on March 28, 2005. Dr. Mollman stated that Shannon suffered "approximately three blows to the head." One blow was done with a sharp instrument and resulted in a scalp laceration that started just above the eyebrow and continued to behind the ear. The impact caused a skull fracture, which resulted in fragments of the skull tearing the lining of the brain otherwise known as the dura. This blow also caused spinal fluid to leak into the wound. Dr. Mollman testified that it takes significant force to fracture the forehead part of the skull. He stated that the CT scan revealed a "significant intracranial injury with air inside the brain [and] blood inside the brain." He concluded that this "type of injury carries [the] potential [of] dying from it."

¶ 6. Shannon suffered two other blows to the head: one located on the left side of her head near the temple region, and the second located on the right side of her head just in front of the ear. Dr. Mollman further stated that Shannon suffers from post-traumatic headaches, which will likely be life-long, and she suffers from memory deficits, which will probably end within a year of the injury.

¶ 7. A criminal complaint was filed on September 7, 2004.[4] The mayhem charge at issue was added in the amended information, which was filed November 23, 2005. It charged Quintana with four counts: (1) may-

---

[4] The initial criminal complaint, filed on September 7, 2004, charged Quintana with one count of attempted first-degree intentional homicide with domestic abuse and dangerous weapon enhancers, and a second count of theft with a domestic abuse enhancer. The State amended the criminal complaint twice: first to correct the last name of the victim, and a second time to add a third count, solicitation of first-degree intentional homicide. The first information filed reflected the counts in the second amended criminal complaint.

hem, with violent crime in a school zone, domestic abuse, and use of a dangerous weapon enhancers; (2) first-degree reckless injury, with domestic abuse and dangerous weapon enhancers; (3) aggravated battery, with violent crime in a school zone, domestic abuse, and use of a dangerous weapon enhancers; and (4) solicitation of first-degree intentional homicide.

¶ 8. Quintana objected to the amended information. He argued that, as a matter of law, the allegations did not support the offense of mayhem, and the violent crime in a school zone penalty enhancer was unconstitutional as applied to him. The circuit court agreed and concluded that the mayhem charge was improper because "other bodily member" was limited to those parts of the body listed or associated with the parts listed in the mayhem statute. The circuit court reasoned that skin or bone, like that found in the forehead, can be found throughout the human body, and therefore, interpreting the statute to include the forehead would eliminate any limitations in the mayhem statute as to what parts of the body are included. The circuit court also concluded that the violent crime in a school zone penalty enhancer was unconstitutional as applied to Quintana because it is extremely unlikely that "domestic violence" would ever endanger students in school, and the proximity of the school bears no logical relationship to a legitimate government interest.

¶ 9. In a published decision, the court of appeals reversed the circuit court's order. *State v. Quintana,* 2007 WI App 29, 299 Wis. 2d 234, 729 N.W.2d 776. It concluded that "the mayhem statute covers cutting or mutilation to the forehead." *Id.*, ¶ 17. It reasoned that because the forehead is skin and bone protecting parts of the brain, an attack on the forehead threatens injury to the brain. Therefore, the forehead is an "other bodily

member." The court, however, declined to conclude that the entire head was an "other bodily member."

¶ 10. The court of appeals also concluded that the violent crime in a school zone penalty enhancer, Wis. Stat. § 939.632, is not unconstitutional as applied to Quintana because there are "rational, reasonable bases" for the penalty enhancer. The court reasoned that it is clear the legislature sought to create a protective zone around schools regardless of time of day, calendar date, or whether children are actually present. The court of appeals was persuaded by the State's list of plausible reasons for the statute's creation, such as children congregate around schools, increased concentration of children near schools, and the likelihood that violent crime in the home could "spill over into public areas."

## II. STANDARD OF REVIEW

¶ 11. "Statutory interpretation is an issue of law which we review de novo. While the review is de novo, this court benefits from the analyses of the circuit court and the court of appeals." *Megal Dev. Corp. v. Shadof,* 2005 WI 151, ¶ 8, 286 Wis. 2d 105, 705 N.W.2d 645.

¶ 12. The constitutionality of a statute is a question of law, which this court determines independently of both the circuit court and court of appeals but still benefiting from their analyses. *State v. Radke,* 2003 WI 7, ¶ 11, 259 Wis. 2d 13, 657 N.W.2d 66. "All statutes enjoy a presumption of constitutionality and the heavy burden of overcoming this presumption lies with the person attacking the statute." *Id.* "This court will sustain a statute against a constitutional challenge if there is 'any reasonable basis' for the statute" even if that

reasonable basis is not expressly stated by the legislature. *Id.* "[I]f the court can conceive of facts on which the legislation could reasonably be based, it must uphold the legislation as constitutional." *Id.*

## III. ANALYSIS

¶ 13. At issue in this case is the meaning of the phrase "other bodily member" in Wis. Stat. § 940.21, Mayhem. The mayhem statute provides, "[w]hoever, with intent to disable or disfigure another, cuts or mutilates the tongue, eye, ear, nose, lip, limb or other bodily member of another is guilty of a Class C felony." "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. This court begins statutory interpretation with the language of a statute. *Id.,* ¶ 45. If the meaning of the statute is plain, we ordinarily stop the inquiry and give the language its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*

¶ 14. Context and structure of a statute are important to the meaning of the statute. *Id.,* ¶ 46. "Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.* Moreover, the "statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." *Id.* "A

statute's purpose or scope may be readily apparent from its plain language or its relationship to surrounding or closely-related statutes—that is, from its context or the structure of the statute as a coherent whole." *Id.*, ¶ 49.

¶ 15. At the outset, we acknowledge the difficulty of interpreting this statute. The statutory language of mayhem is based upon and is very similar to the Coventry Act—a statute from seventeenth century England. Some states that have retained the crime of mayhem have modernized their mayhem statutes seemingly in an effort to clarify its application. *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 16.5, 599–600 nn.6, 7, and 8 (2d ed. 2003) (referencing current mayhem statutes). Our state legislature may find it useful to re-examine our mayhem statute.

## A. History of mayhem

¶ 16. The history of "mayhem" and Wisconsin's mayhem statute is quite extensive. The English common-law crime of mayhem originated from the principle that "he that maimed any man whereby he lost any part of his body was sentenced to lose the like part." William Blackstone, 4 *Commentaries* *206 (Lewis ed. 1897). However, the crime was soon punished by fine and imprisonment because punishment could not be repeated if it remained "an eye for an eye." *Id.* Blackstone defines mayhem as "the violently depriving another of the use of such of his members as may render him the less able, in fighting, either to defend himself or to annoy his adversary." *Id.* at *205. Thus, at common law it was not mayhem if one merely disfigured another or even disabled parts of the body not critical to fighting, such as the nose or ear. *Id.* It appears that the first statutory expression of mayhem

was in 1403, which punished a person for cutting out the tongue or putting out the eye of a person who could testify against him. *Id.* at *206. A subsequent statute punished persons for maliciously and unlawfully cutting off the ear of another. *Id.* at *206–07.

¶ 17. Following this statute was the Coventry Act, which was "by far the most severe and effectual" mayhem statute. *Id.* This early English statute, which laid the foundation for even the modern day mayhem statute, was established in 1670. *Id.* It arose out of an incident whereby Sir John Coventry's nose was slit because of "obnoxious words uttered by him in Parliament." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 239 (3d ed. 1982). At common law, such conduct did not constitute mayhem, emphasizing the weakness of the law of mayhem. *Id.* As stated in Blackstone, the Coventry Act provided:

> By this statute it is enacted that if any person shall of malice aforethought and by lying in wait unlawfully cut out or disable the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable any limb or member, of any other person, *with intent to maim or disfigure him,* such person, his counsellors, aiders, and abettors, shall be guilty of felony without benefit of clergy.

Blackstone, *supra,* at *207 (emphasis included in Blackstone). "This statute did not displace the English common law of mayhem [] but provided an increased penalty for intentional maiming and for the first time extended the crime to include [intentional] disfigurement []." Perkins & Boyce, *supra,* at 240 (footnotes and emphasis omitted). The Coventry Act represented an expansion of common-law mayhem, which punished only for disabling members of the body important for fighting. The Coventry Act punished persons for dis-

628

abling other members of the body not critical to fighting, and it further prohibited the intentional disfiguring of another person.

¶ 18. American mayhem statutes in the nineteenth century were nearly identical to the Coventry Act.[5] Even prior to statehood, the statutes of Wisconsin contained the crime of "maiming or disfiguring" in almost identical form to the Coventry Act.[6] Until 1955, the mayhem statute remained nearly unchanged except for an increase in the maximum penalty to 15 years and minor word changes, which are insignificant to our question today.[7]

---

[5] *See, e.g., Moore v. State,* 3 Pin. 373 (Wis. 1851) (citing to Rev. Stat. c. 133, § 31); *Foster v. People,* 1 Cow. Cr. Rep. 508, 6 (N.Y. 1872) (citing 2 Rev. Stat., c. 665, § 36); *O'Brien v. State,* 21 Ohio Cir. Dec. 33, 1 (1908) (citing to Sec. 6819 Rev. Stat.).

[6] In the 1839 Statutes of the Territory of Wisconsin, Maiming or disfiguring, read:

> That if any person, with malicious intent, to maim or disfigure, shall cut out or maim the tongue, put out or destroy an eye, cut or tear off an ear, cut or slit or mutilate the nose or lip, or cut off or disable a limb or member of any other person, every such offender, and every person privy to such intent, who shall be present aiding in the commission of such offence, shall be punished by imprisonment in the state prison, not more than five years nor less than one year, or by fine, not exceeding one thousand dollars nor less than two hundred dollars.

Statutes of the Territory of Wisconsin, An Act to Provide for the Punishment of Offences Against the Lives of Persons or Individuals, § 9, 348 (1839).

[7] Section 340.35, Mayhem, of the 1953 Wisconsin Statutes read:

> Any person with malicious intent to maim or disfigure, who shall cut out or maim the tongue, put out or destroy an eye, cut or tear off an ear, cut, slit or mutilate the nose or lip, or cut or disable a limb or member of another person, and any person privy to such

¶ 19. The legislature revised the mayhem statute in 1955 when it revised the entire Wisconsin criminal code.[8] The Legislative Council—Criminal Code Advisory Committee—nearly removed mayhem from Wisconsin's criminal code.[9] 1953 A.B. 100, at 70 (§ 340.21 comment). The council initially consolidated the 1953 statutes of "mayhem" and "assault, great bodily harm" into "aggravated battery," which it defined as "[w]hoever intentionally causes great bodily harm to another may be imprisoned not more than 15 years." *Id.*, at 69–70.

¶ 20. The proposed revisions of the criminal code included comments stating that mayhem would now fall under aggravated battery and describing this change as a "substantial restatement of the old law."[10] *Id.* at 69. However, the legislature ultimately retained

intent who shall be present aiding in the commission of such offense shall be punished by imprisonment in the state prison, not more than fifteen years nor less than one year, or by fine not exceeding five thousand dollars nor less than two hundred dollars.

[8] *See generally* William A. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350 (1956) (discussing the overhaul of Wisconsin's criminal code); *see also* Wisconsin Legislative Council—Criminal Code Advisory Committee minutes re criminal code bill, 1953 A.B. 100. The revisions of the code were conducted by a 16–member committee of the Wisconsin bar association under the chairmanship of the Hon. Edward J. Ruetz, technical staff, and the legislative council's judiciary committee. *Platz, supra,* at 351.

[9] *See generally* Wisconsin Legislative Council—Criminal Code Advisory Committee minutes re criminal code bill, April 29, 1954.

[10] 1953 A.B. 100, at 70 (§ 340.21 comment) provides:

[Wisconsin Statute §] 340.35, Mayhem dealt with the common-law crime of injuring another so that he loses the use of one of his members and is less able to fight. It also included certain

mayhem largely to differentiate those who caused great bodily harm, which resulted in a disabled or disfigured victim, from those who possessed the specific intent to disable or disfigure—the latter punishing much more severely.[11]

¶ 21. The 1955 revised version read: "Whoever, with intent to disable or disfigure another, cuts or

disfigurement—slitting or mutilating the nose or lip or cutting off an ear. All of these would come within the definition of great bodily harm.

[11] At least two meetings of the Criminal Code Advisory Committee reference the mayhem statute. Of concern in the first meeting referencing mayhem, April 29, 1954, was incorporating mayhem into aggravated battery, and the penalty for aggravated battery, which would include the accidental cutting off of another's nose, would be 15 years whereas "a person who intentionally just about killed another" only faced a three-year penalty. The committee agreed to continue mayhem in largely the same language with the exact wording to be worked out by the technical staff. The second meeting on June 3, 1954, approved the revised mayhem statute. Aggravated battery was reduced to a maximum 5-year penalty from 15 years when it no longer included mayhem. It appears that mayhem was retained in order to severely punish those who intentionally maim or disfigure another and to distinguish those who accidentally cut off another's nose (aggravated battery) from those who have a specific intent to disable or disfigure. Moreover, mayhem was removed from the aggravated battery statute to harmonize the penalties for aggravated battery—which would include the accidental cutting off of another's nose and give rise to 15 years of exposure with mayhem included in the aggravated battery statute but only five years exposure with mayhem removed from the aggravated battery statute—with the penalty for "a person who intentionally just about killed another," faced a three-year penalty. *See* Wisconsin Legislative Council— Criminal Code Advisory Committee minutes re criminal code bill, 1953 A.B. 100 (specifically those meetings on April 29 and June 3 of 1954).

mutilates the tongue, eye, ear, nose, lip, limb or *other bodily member* of another, may be fined not more than $5,000 or imprisoned not more than 15 years or both." Wis. Stat. § 940.21 (effective July 1, 1955) (emphasis added).

¶ 22. The phrase "other bodily member" likely came from Wisconsin's "great bodily harm" statute. Great bodily harm was defined as: "[B]odily injury which creates a high probability of death, or which causes serious disfigurement, or which causes permanent or protracted loss or impairment of the function of any bodily member or organ." 1953 A.B. 100, at 14 (setting forth the proposed Wis. Stat. § 339.22(12)).

¶ 23. Prior to the 1955 criminal code revision, no mayhem statute in Wisconsin's history used the term "other bodily member." As previously stated, the original plan of the 1955 criminal code revision was to incorporate mayhem into aggravated battery. Aggravated battery required great bodily harm, which included "bodily member" as part of its definition. Great bodily harm appeared in the criminal code for the first time in 1955.[12] *See* Chapter 623, Laws of 1953 (effective July 1, 1955 and defined in section 339.22(12)). The

_____

[12] However, the great bodily harm statute was revised the very next year to add "or other serious bodily injury" to the end of the statute. *See* Chapter 696, Laws of 1955 (effective July 1, 1956). In 1976, this court concluded that the addition of "or other serious bodily injury" to the end of the great bodily harm statute in 1956 represented a "broadening of the scope of the statute to include bodily injuries which were serious, although not of the same type or category as those recited in the statute." *La Barge v. State,* 74 Wis. 2d 327, 331–32, 246 N.W.2d 794 (1976). Today, great bodily harm reads: " 'Great bodily harm' means bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of

definition of "great bodily harm" was taken from the Restatement of Torts § 63 cmt. b, which specifically mentions mayhem.[13] While the phrase "other bodily member" likely came from the great bodily harm statute, this does not explain or provide insight as to what "other bodily member" means for purposes of our analysis.

¶ 24. The only recent changes to the mayhem statute occurred in 1977 when the legislature classified mayhem as a Class B felony and 2001 when it was reclassified as a Class C felony, thus revising only the penalty portion of the statute.[14] The current version of Wisconsin's mayhem statute reads:

---

any bodily member or organ or other serious bodily injury." Wis. Stat. § 939.22(14). " 'Bodily harm' means physical pain or injury, illness, or any impairment of physical condition." Wis. Stat. § 939.22(4).

[13] The 1955 definition of "great bodily harm" was taken from Restatement of Torts § 63 cmt. b, which read:

> Meaning of "serious bodily harm." The phrase "serious bodily harm" is used to describe a bodily harm, the consequence of which is so grave or serious that it is regarded as differing in kind, and not merely in degree, from other bodily harm. A harm which creates a substantial risk of fatal consequences is a "serious bodily harm" as is a harm, the infliction of which constitutes the crime of mayhem. The permanent or protracted loss of the function of any important member or organ is also a "serious bodily harm."

See 1953 A.B. 100, at 14 (§ 339.22(12) comment).

[14] Both the 1977 and 2001 classifications were based on the degree of actual or potential harm involved in the commission of the crime in question. The 2001 classification automatically moved all 1977 Class B felonies to Class C felonies, and then each was reviewed to ensure proper and consistent placement with the code. See Classifying Penalties to the Criminal Code: Report to the 1973 Legislature, pg. 11 (1973); Criminal Penalties Study Committee, Final Report, pgs. 1–14, 24 (August 31, 1999).

> Whoever, with intent to disable or disfigure another, cuts or mutilates the tongue, eye, ear, nose, lip, limb *or other bodily member* of another is guilty of a Class C felony.

Wis. Stat. § 940.21 (emphasis added).[15]

## B. Interpretation of Wisconsin's mayhem statute

¶ 25. The rationale underlying the modern mayhem statute is the "preservation of the natural completeness and normal appearance of the human face and body, and not, as originally, the preservation of the sovereign's right to the effective military assistance of his subjects." 2 LaFave, *supra,* § 16.5, at 600. The Coventry Act changed the rationale to protecting more than just those parts of the body critical to fighting. "A statute must be construed, [] in light of its manifest object, the evil sought to be remedied." *State v. Clausen,* 105 Wis. 2d 231, 239, 313 N.W.2d 819 (1982). The purpose of Wisconsin's mayhem statute is to punish those who intentionally disable or disfigure another by cutting or mutilating the victim's member(s) including "other bodily member(s)," but the phrase "other bodily member" raises a question as to what parts of the body—if any—the mayhem statute is limited.

¶ 26. However, the manner in which the legislature uses the phrase "other bodily member" indicates that it intended the phrase to be construed broadly and

---

[15] Only a few modern day criminal codes retain the stand alone crime of mayhem. 2 Wayne R. LaFave, *Substantive Criminal Law* § 16.5(b) (2d ed. 2003) (citing to Cal. Penal Code § 205; Mass. Gen. Laws Ann. ch. 265, § 14; Mich. Comp. Laws Ann. § 750.397; Miss. Code Ann. § 97–3–59; Utah Code Ann. § 76–5–105; and Wis. Stat. Ann. § 940.21).

not in a restrictive manner. The specific terms listed in the statute have no common feature or class from which one could ascertain an intention to restrict the meaning of the general term.

¶ 27. Ejusdem generis, a canon of construction, instructs that when general words follow specific words in the statutory text, the general words should be construed in light of the specific words listed. Thus, the general word or phrase will encompass only things of the same type as those specific words listed. *Adams Outdoor Adver., Ltd. v. City of Madison,* 2006 WI 104, ¶ 62 n.15, 294 Wis. 2d 441, 717 N.W.2d 803. Legislatures use this common drafting technique to save the legislature the time and effort of spelling out every possible situation in which the statute could apply. 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47.17, at 370–73 (7th ed. 2007).

¶ 28. In the case at hand, we can discern no class that encompasses all of the specific terms listed. When specific terms do not suggest a particular class, the rule of ejusdem generis does not apply. *Id.,* § 47.20.

¶ 29. The relevant terms enumerated in the mayhem statute are: tongue, eye, ear, nose, lip, limb or other bodily member. We first look to determine whether there is a common class that can be derived from the specific enumerated terms. One possible class may be parts of the body that protrude from the body, but the eyes and tongue do not naturally protrude from the body like the ears, nose and limbs. If not for the inclusion of the word "limb," the class could be "crucial areas of the face," but the insertion of the word limb renders this unusable as a class.

635

¶ 30. The tongue, eyes, ears, and nose are all associated with one of the five senses, but the lips and limbs are not unless you consider sense of touch. However, sense of touch could incorporate the entire body, so that does not assist us in trying to limit the definition of the general term. Furthermore, member includes internal organs, as we know from the dictionary and *Moore v. State,* 3 Pin. 373 (Wis. 1851), but we can discern no "class" from the specific terms in the enumerated list that would also include internal organs.

¶ 31. When no class can be discerned, the canon of ejusdem generis cannot be used. *See* 2A Singer et al., *supra,* § 47.20. More significant, when a class cannot be ascertained, it indicates that the legislature did not intend for the general term to be limited by the specific terms listed in the statute. *See id.* at n.3 (referencing a number of state and federal cases including *United States v. Lawrence,* 26 F. Cas. 878 (C.C.S.D.N.Y. 1875), which concluded that the listed items had no common features from which one could ascertain an intention to restrict the meaning of the general term).

¶ 32. When the legislature does not use words in a restricted manner, the general terms should be interpreted broadly to give effect to the legislature's intent. In *Helvering v. Stockholms Enskilda Bank,* the United States Supreme Court stated:

> To ascertain the meaning of the words of a statute, they may be submitted to the test of all appropriate canons of statutory construction, of which the rule of *ejusdem generis* is only one. *If, upon a consideration of the context and the objects sought to be attained and of the*

636

*act as a whole, it adequately appears that the general
words were not used in the restricted sense suggested by
the rule, we must give effect to the conclusion afforded
by the wider view* in order that the will of the Legisla-
ture shall not fail.

*Helvering,* 293 U.S. 84, 89 (1934) (emphasis added).

¶ 33. Because we can discern no class from the
specific terms listed in the statute, we must conclude
that the legislature did not use "other bodily member"
—formerly known as "member"—in a restrictive sense.
Thus, the legislature intended it to be interpreted
broadly. As a result, using the phrase "other bodily
member" along with the other parts of the body listed in
the statute renders the rest of the human body included
within the meaning of the mayhem statute. In short,
"other bodily member" encompasses all bodily parts.

¶ 34. Quintana asserts that the covered "class" is
limited to specific parts of the body that serve a
function on their own, and if those parts are taken
away, a person could still live. However, this is unwork-
able as a "class" to determine the scope of "other bodily
member" because it leads to absurd results. For ex-
ample, following Quintana's logic, since we have two
kidneys, they are members, but because we have only
one liver, it is not a member. Both the kidney and liver
are of the same class, internal organs, yet, if one is
taken away a person dies but if the other is taken away
the person may still live. This practical application of
Quintana's argument shows why it is absurd. As a
result, because no class can be discerned, the canon of
ejusdem generis must not be used, and we must inter-
pret the phrase broadly.

■■■

¶ 35. Quintana also puts forth the rule of noscitur
a sociis to support his argument. This canon instructs

637

that words are known from their associates. *Wisconsin Citizens Concerned for Cranes & Doves v. DNR,* 2004 WI 40, ¶ 40, 270 Wis. 2d 318, 677 N.W.2d 612. "[A]n unclear statutory term should be understood in the same sense as the words immediately surrounding or coupled with it." *Id.* This canon is a variation of ejusdem generis. 2A Singer et al., *supra,* § 47.17. However, this canon does not apply in this case because the specific words listed do not have similar meaning except that they are all members, which provides little guidance in defining "other bodily member." Rather, this would suggest that "other bodily member" is an expansive, not restrictive term added to the end of the statute in order to cover those other members not specifically listed.

¶ 36. If the term "member"—or "other bodily member" as it is used in the current mayhem statute— were constrained to exclude the forehead, as Quintana urges, this would lead to absurd results that would frustrate the purpose of the statute. *See generally State v. Morse,* 126 Wis. 2d 1, 4, 374 N.W.2d 388 (Ct. App. 1985) (concluding, "[t]o define vagina according to its medical definition would permit a defendant to touch almost the entire female external genitalia without legal consequence," which is contrary to the legislature's intent and would lead to absurd results if construed so narrowly).

¶ 37. For example, if a defendant poured acid over a victim's leg—a limb—causing permanent disfigurement, it could lead to a mayhem conviction so long as the other elements of the statute were met.[16] *See* 2 LaFave, *supra,* § 16.5(c) (stating "[a] modern weapon of some potency is acid thrown at the victim's face or

_____

[16] *See* ¶¶ 70–73 of this opinion for a discussion regarding the elements of mayhem under Wis. Stat. § 940.21.

body"); *see, e.g.,* Lawrence Van Gelder, *Victor Riesel, 81, Columnist Blinded by Acid Attack, Dies,* N.Y. Times, Jan. 5, 1995 (describing the horrific acid attack in 1956 that blinded the syndicated labor columnist). However, under Quintana's interpretation of "other bodily member," if a defendant, who possessed the requisite intent, poured acid over a victim's head without permanently disfiguring or disabling the victim's eyes, nose, ear, or lip, it would not constitute mayhem even though the defendant had intentionally, permanently disfigured the victim's head and appearance—the very evil the mayhem statute seeks to punish.

¶ 38. Consider also the nonconsensual, permanent tattooing or branding of another's forehead, which certainly is a prominent location for an unwanted mark. *See, e.g., People v. Page,* 104 Cal. App. 3d 569, 576–77 (1980) (concluding that the nonconsensual tattooing of a woman's breast constitutes mayhem, but concluding the tattooing of the abdomen is questionable because the abdomen may not qualify as a member). A defendant could tattoo the most obscene symbol imaginable on the forehead of another and not be guilty of mayhem under Quintana's theory, but he or she would be guilty of mayhem if the tattoo or brand appeared on the victim's arm. These scenarios produce absurd results when a heinous act constitutes mayhem if the victim's leg is involved, but it is not mayhem when the very same act involves the forehead, which is a much more prominent and difficult area of the body to hide from the view of others. The same absurd results arise in a number of other scenarios, such as cutting and burning the leg, which could constitute mayhem, but the same act to the forehead would not be mayhem.

¶ 39. The mayhem statute seeks to punish those who intentionally disable or disfigure another person's

639

bodily member. Absurd results would certainly arise if the forehead were excluded. For example, disabling the nose is mayhem, but disabling the forehead, which protects one of the most important organs of the body, would not constitute mayhem. A statute must be interpreted in light of its manifest object; therefore, we conclude that the forehead qualifies as an "other bodily member."

¶ 40. The legislature reaffirmed its interest in severely punishing the intentional disabling or disfiguring of another when it retained mayhem in the 1955 criminal code revision after it was originally excluded from the statutes during the first round of revisions. Moreover, it reaffirmed a broad definition of "member" when it did not use "other bodily member" in a restrictive manner.

¶ 41. A nineteenth century Wisconsin mayhem case, which broadly defined the word "member" to include female reproductive organs, is consistent with our interpretation of member. In *Moore v. State,* Margaret D. Moore's husband assaulted her with the intent to maim or disable her "private parts." This court concluded that "member" under the mayhem statute at that time included female reproductive organs. "Our legislature certainly gave the same protection to the internal organs of the female that it did to the external organs of the male, and there is no reason why it should not." *Moore,* 3 Pin. 373.

C. Dictionaries and cases from other jurisdictions

¶ 42. When interpreting a word or phrase in a statute, it often proves useful to look at dictionary definitions or sometimes even case law from other states. However, in the case at hand, these tools lead to

equivocal results rather than support a broad or narrow interpretation of "other bodily member."

¶ 43. The dictionary definition of "member" is quite extensive.[17] While "[m]any words have multiple dictionary definitions[, and] the applicable definition depends upon the context in which the word is used," *Kalal,* 271 Wis. 2d 633, ¶ 49, the dictionaries yield equivocal results in this case even when the context of "other bodily member" is known.

¶ 44. The second edition of *Webster's New International Dictionary* defines "member" as "1.a *Archaic.* A bodily part or organ; esp., a limb. b *Obs[olete],*[18] A private part. . . . 7. *Anat[omy],* A part or organ of the animal body; esp., a limb or other separable part."[19] The second edition of *The Random House Dictionary of the English Language* defines "member" as "3. a part or organ of an animal body; a limb, as a leg, arm, or wing. . . . 5. the penis."[20] The first edition of the same dictionary provides synonym explanations for the par-

---

[17] *See, e.g., Swatek v. County of Dane,* 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995) (stating that this court may consult a dictionary for the common meaning of a word); *but see Kopke v. A Hartrodt S.R.L.,* 2001 WI 99, ¶ 16, 245 Wis. 2d 396, 629 N.W.2d 662 (stating that a dictionary may not be able to resolve the issue of whether a word should be broadly or narrowly defined).

[18] A designation of "Obs" means obsolete. "An Obsolete Word is one that has entirely disappeared from current usage. In general, this Dictionary regards as obsolete all literary or colloquial words, and all meanings, that have not appeared in print since 1660." *Webster's New International Dictionary* xcv, explanatory note 54 (2d ed. 1935).

[19] *Webster's New International Dictionary* 1533 (2d ed. 1935).

[20] *The Random House Dictionary of the English Language* 1198–99 (2d ed. 1987).

ticular entry. It reads, "Member, Limb refer to an integral part of a larger body. Member is the general term applied to any integral part or vital organ of an organized animal body . . . The nose, tongue, and arms are members of the body. Limb, which once, like Member, referred to any organ of the body, is now restricted to the legs and arms . . . ."[21]

¶ 45. *The Oxford English Dictionary* contains twelve entries, each with explanations, for the word "member." "1.a. A part or organ of the body; chiefly, a limb or other separable portion" (as opposed to the trunk[22]). "1.b. spec. (after L): = 'privy member.' " This dictionary provides examples of the word's usage as it corresponds to different periods in time. Usage of the word "member" under entry 1.a., which defined member as a "part or organ of the body," provides in part:

> 1495 *Act. II Hen. VII,* c. 3 § 3 Any other offence wherfor any persone shall lose life or member. . . . 1611 Bible *Deut.* xxiii. I Hee that hath his priuie member cut off. 1660 F. Brooke tr. *Le Blanc's Trav.* 61 They tye a cloth only to hide their privie members. . . . 1823 J.F. Cooper *Pioneers* v. (1869) 24/2 There was something noble in the rounded outlines of his head and brow. The very air and manner with which the member haughtily maintained itself [etc].

*The Oxford English Dictionary* Vol. IX, 590 (2d ed. 2000).

---

[21] *The Random House Dictionary of the English Language* 894 (1st ed. 1966) (emphasis omitted).

[22] *The Oxford English Dictionary* defines "trunk" as "[t]he human body . . . without the head or esp[ecially] without the head and limbs . . . ." *The Oxford English Dictionary* Vol. XVIII, 617 (2d ed. 2000).

¶ 46. Thus, the multiple dictionary definitions give conflicting answers as to whether the forehead is a member. On the one hand, member seems to encompass organs. The brain is an organ and impairment of its function can most certainly affect the functioning of the tongue, eyes, ears, lips, nose, and limbs. In that sense, including the brain within the definition of "other bodily member" makes sense as the brain directly affects the functioning of the other parts of the body.

¶ 47. Another definition of "member" could lead one to conclude that "other bodily member" refers only to male and female reproductive organs, deriving the term from the word "privie" or "private." However, Webster's dictionary identifies this definition as obsolete. In addition, restricting "member" to mean only private parts is doubtful because the legislature has had no problem delineating the "private parts" of humans in other areas of the statutes. During the 1955 criminal code revision, the legislature did not use the word "member" in other statutes as a means to identify male or female reproductive organs. *See, e.g.,* Sexual perversion, Wis. Stat. § 944.17 (1955) (utilizing the word "sex organ"); Lewd and lascivious behavior, Wis. Stat. § 944.20 (1955) (utilizing the word "sex organ"). Subsequently, the legislature has used "penis" or "vagina" in Wisconsin Statutes. *See, e.g.,* Words and phrases defined, Wis. Stat. § 939.22(19) (1979–80) (" 'Intimate parts' means the breast, buttock, anus, groin, scrotum, penis, vagina or pubic mound of a human being.").

¶ 48. Yet another dictionary definition indicates member could be anything besides the trunk and another includes all integral parts of the body. Lastly, the dictionaries also define member as "any part of the body." Thus, the dictionaries lead to equivocal results as to whether the forehead is a member. Moreover, there

are very few parts of the body not included in at least one of these many definitions. Perhaps this indicates that "member," or "other bodily member," is meant to include every part of the entire body.

¶ 49. One may also turn to other states to guide statutory interpretation, which can be especially useful when the relevant statute has been widely used and dates back to the 1400s. However, a review of the case law with regard to mayhem is also equivocal as to whether the forehead constitutes a member or "other bodily member." In *Foster v. People,* the court concluded that the victim's skull fracture was not mayhem. *Foster v. People,* 1 Cow. Cr. Rep. 508, 8 (N.Y. 1872). The Court of Appeals of New York stated, "[a]n injury to the head or skull is not specified by Hawkins or Blackstone as mayhem . . . ." *Id.* at 5 (emphasis omitted). In contrast, however, the court stated, "the breaking of the skull" was considered mayhem under the definition by Lord Coke. *Id.* Lord Coke stated:

> "Mayhem," he says, "signifieth a corporal hurt, whereby a man looseth a member by reason whereof he is less able to fight, as by putting out his foretooth, *breaking his skull,* striking off his arm, hand or finger, cutting off his leg or foot, or whereby he looseth the use of any of his said members." (Coke Litt., 288 a.)

*Id.* (emphasis added).[23]

---

[23] Lord Coke referred to the authority of Glanville and Britton in support of his interpretation:

> "Mayhem," says Glanville, "signifies the breaking of any bone or injuring the head by wounding or abrasion. In such case the accused is obliged to purge himself by the ordeal, that is, by the hot iron, if he be a freeman; by water, if he be a rustic." (Glanville, Blain's translation, book 14, chap. 1, 350; see, also, Britton, Nichols' translation, liv. 1, chap. 26, fol. 48*b,* 49*a,* 123.)

*Foster,* 1 Cow. Cr. Rep. 508, at 5.

¶ 50. Thus, even historically, no consensus existed as to whether a skull fracture or injury to the forehead could constitute mayhem. The New York court was persuaded by the conclusion that a blow to the head does not indicate intent to maim but rather intent to kill. *Id.* at 8. The court stated, "[a]nd while it was for the jury to determine with what intent the blow was inflicted, we cannot, without doing violence to common sense, say that the prisoner may have intended to break the skull of Putnam without producing death." *Id.*

¶ 51. However, a much earlier English case from *A Complete Collection of State Trials* is inconsistent with the New York court's decision. In 1722, at the trial of John Woodburne and Arundel Coke, the defendants tried to escape a mayhem conviction by asserting that they did not intend to maim when they brutally cut up the face of the victim with a hedge-bill; rather, they intended to kill him. "Trial of John Woodburne and Arundel Coke" 16 *A Complete Collection of State Trials* 54, 89 (1812). The court responded with disapproval:

> And that this was with an intent to disfigure, must be submitted upon the fact and the evidence. A man uses a weapon fit to maim and to disfigure, he cuts another on the face and does disfigure him, shall he afterwards be at liberty to say, it was not his intent so to do? How dangerous that would be, is obvious to every one; this act would then be easily eluded . . . .

The Woodburne court's reasoning is persuasive in that it is possible one could intend to maim as opposed to kill when the action consists of attacking a victim's forehead.

¶ 52. In 1908, an Ohio court concluded that striking a person on the head could constitute mayhem although the court did not explicitly conclude that the forehead was a member. *O'Brien v. State,* 21 Ohio Cir.

Dec. 33, 4 (1908). An 18–inch gas pipe wrapped with heavy paper was used to strike another over the head. *Id.* at 1. The victim fell to his knees and pulled out a revolver, shooting and killing one of the assailants. *Id.* The court concluded:

> So a blow upon the head made under the circumstances shown in this case may be presumed to have been made with intent to cause the loss of the use of some important member of the body. Indeed, it is well settled by medical authority that a violent blow upon the head not fracturing the skull frequently does cause the paralysis of an arm or leg. American Text Book of Surgery, Principles and Practice of Surgery by De Costa.

*Id.* at 4.

¶ 53. While it is not entirely clear whether the Ohio court would have considered a blow upon the head, which only disabled the brain or skull, as disabling a member, it is clear, however, that a blow to the head constituted intent to disable because it often causes the paralysis of the victim's limbs. Thus, a blow to the head may constitute mayhem.

¶ 54. Accordingly, a historical analysis of the case law is not particularly helpful. Some authorities conclude that an injury to the forehead—a skull fracture—could constitute mayhem. However, the courts' reasoning varies, such as an injury to the head could affect other members and thus constitute mayhem because a limb was disabled. However, other authorities seem to conclude that the forehead is not a member and thus injuries to the forehead, like a skull fracture, cannot constitute mayhem.

¶ 55. Even modern mayhem cases differ as to whether the head or forehead is a "member." For ex-

ample, California courts have concluded that the head qualifies as a member.[24] In *People v. Newble,* the court concluded that in light of the rationale—the preservation of the natural completeness and normal appearance of the human face and body—there is "no tenable reason for distinguishing prominent facial wounds to a nose, ear or lip, from comparable wounds which happen to miss one of those areas of the head specifically mentioned in section 203." *Newble,* 120 Cal. App. 3d 444, 451 (1981). Such a trivial distinction, the court concluded, would be undesirable and absurd. *Id.* Therefore, it concluded that a facial laceration from the ear to the chin could constitute mayhem.[25]

¶ 56. On the other hand, a 1956 decision from a Pennsylvania court concluded that the face does not qualify as a limb or member. *Commonwealth v. Patterson,* 8 Pa. D. & C.2d 227, 228 (1956). The defendant bit the victim's lower left side of the face. *Id.* The court concluded that the face did not qualify as a member under Pennsylvania's mayhem statute, which reads: "Whoever . . . unlawfully . . . cuts off or disables any limb or member of another . . . ." *Id.* Other states, such as Massachusetts have upheld mayhem convictions for blows to the head, but those states had modified their mayhem statutes. As a result, it was not necessary for ·

---

[24] California mayhem statute reads:

> Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem.

Cal. Penal Code § 203 (West 1999).

[25] *See also People v. Page,* 104 Cal. App. 3d 569, 577 (1980) (concluding that the female breast qualifies as a "member").

those states to decide whether the head or forehead qualified as a member or "other bodily member."[26]

¶ 57. While the dictionary definitions or the guidance from other states produces equivocal results, the manner in which the legislature uses the phrase "other bodily member" indicates that the legislature intended that phrase to be construed broadly, and thus we have given effect to that intent.

## D. Defendant's arguments

¶ 58. Quintana argues that a member is something that has function in and of itself, and if the member is lost, the victim can still survive. His interpretation would lead us to conclude that mayhem occurs when a defendant repeatedly strikes a victim in

---

[26] *See, e.g., Commonwealth v. Lay,* 63 Mass. App. Ct. 27, 29, 36 (2005) (concluding that when the defendant struck the victim's head with a metal object sufficient to cause blood and brain matter to spray out, it was mayhem under Mass. Gen. Laws Ann. ch. 265, § 14 (LexisNexis 2002). Massachusetts Gen. Laws Ann. ch. 265, § 14, Mayhem; punishment (LexisNexis 2002), reads:

> Whoever, with malicious intent to maim or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is present and aids in the commission of such crime, *or whoever, with intent to maim or disfigure, assaults another person with a dangerous weapon, substance or chemical, and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person,* and whoever is privy to such intent, or is present and aids in the commission of such crime, shall be punished by imprisonment in the state prison for not more than twenty years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two and one half years.

(Emphasis added.)

the knee rendering the limb disabled. However, a defendant who viciously and repeatedly clubs a person over the head does not commit mayhem, under Quintana's view, unless the brain—an organ—is permanently disabled because the forehead does not serve a function in and of itself.[27]

¶ 59. The forehead, however, does serve a function in that it protects the brain.[28] If the defendant's conduct resulted in the forehead no longer able to serve its function, the victim would be vulnerable to the most minor, subsequent injuries, and thus, the crime of mayhem likely has occurred so long as the other elements of the statute are satisfied. While certainly not every injury to the forehead will constitute mayhem, a disabling injury to the forehead could certainly give rise to mayhem.

¶ 60. Quintana also argues that if "other bodily member" includes the forehead, the other specifically delineated body parts are surplusage. "It is an elementary rule of construction that effect must be given, if possible, to every word, clause, and sentence of a statute." 2A Singer et al., *supra,* § 46.6; *State v. Martin,* 162 Wis. 2d 883, 894, 470 N.W.2d 900 (1991).

---

[27] *See also* ¶¶ 34–36 of this opinion addressing this argument.

[28] *See* Keith L. Moore & Arthur F. Dalley, *Clinically Oriented Anatomy* 893 (5th ed. 2006) (describing fractures of the calvaria (skullcap, which would include the forehead)).

> The convexity of the calvaria distributes and thereby usually minimizes the effects of a blow to the head. However, hard blows in thin areas of the calvaria are likely to produce depressed fractures, in which a bone fragment is depressed inward, compressing and/or injuring the brain. Linear calvarial fractures, the most frequent type, usually occur at the point of impact; but fracture lines often radiate away from it in two or more directions. . . .

(Emphasis omitted.)

¶ 61. However, our conclusion that the forehead qualifies as a member does not render the other enumerated facial features surplusage. Everything in the enumerated list is a member.[29] The tongue, eyes, ears, nose, lips, and limbs are all members. Thus, the inclusion of "or other bodily member" must include members other than those specifically listed in the statute, or the phrase "other bodily member" is meaningless.

¶ 62. However, if we follow Quintana's argument, then all parts of the torso and head, except for those parts of the head listed in the statute, are excluded. If true, then member could mean only sex organ under Quintana's argument because no other body parts are left except for the sex organs. The limbs and the head, except those parts listed in the statute, are excluded. In addition, the torso is excluded under Quintana's argument and some dictionary definitions. Accordingly, only the sex organs are left.

¶ 63. However, we know the legislature did not intend bodily member to mean only sex organ because it did not use that specific phrase, and it has not withheld from using that phrase elsewhere. During the 1955 criminal code revision, the legislature did not use the word "member" in other statutes as a means to identify male or female reproductive organs. *See, e.g.,* Sexual perversion, Wis. Stat. § 944.17 (1955) (utilizing

---

[29] *See* William Blackstone, 4 *Commentaries* *205 (Lewis ed. 1897) (stating that mayhem is defined as depriving another of the use of one of his members, and therefore, the cutting off or disabling a man's hand, striking out his eye or foretooth are all mayhems); *see also* William Blackstone, 3 *Commentaries* *121 (Lewis ed. 1897) (listing members such as the arms, legs, fingers, eyes, foretooth); *The Random House Dictionary of the English Language* 894 (1st ed. 1966) (concluding that the "nose, tongue, arms are members of the body").

the word "sex organ"); Lewd and lascivious behavior, Wis. Stat. § 944.20 (1955) (utilizing the word "sex organ"). If the legislature intended "other bodily member" to mean sex organ, it would have used that phrase as evident from other statutes in the 1955 criminal code revision that used the phrase "sex organ." However, to accept Quintana's surplusage argument, "other bodily member" could mean only sex organ given he does not assert that the torso could be a member.

¶ 64. The specific members listed should not be used to exclude other bodily members not listed, including other members located on the head. For example, Blackstone's commentaries and state cases have concluded that a tooth is a member.[30] However, the tooth could not be a member if Quintana's surplusage argument prevails.

¶ 65. In this case, the enumerated list is a product of history. The first statute listed only the eyes and tongue, but the list expanded into what we basically know it as today. The full list of body parts was first enumerated in the Coventry Act of 1670 and represented parliament's response to the maiming of a member of parliament. The phrase "other bodily member" is meant to address those things not specifically listed but that are also members of the body, such as the reproductive organs, the forehead, or other parts of the body. Nothing indicates that the legislature used the phrase "other bodily member" in a restrictive manner. In fact,

---

[30] See footnote 29; see also Keith v. State, 232 S.W. 321 (Tex. Crim. App. 1921) (concluding that a front tooth is a member of the body); Olson v. Union Pac. R. Co., 112 P.2d 1005 (Idaho 1941) (describing that "[a]t common law, to unlawfully knock out one's 'front tooth' constituted the crime of mayhem" although it had not been determined whether knocking out a tooth fell within Idaho's mayhem statute).

methods of statutory interpretation lead us to the opposite conclusion. The list of body parts should not be used to eliminate other "members" from coming under the mayhem statute; to do so would render the phrase "other bodily member" meaningless.

¶ 66. Quintana also invokes the rule of lenity asserting that the court should interpret "other bodily member" in favor of the defendant. "[W]hen there is doubt as to the meaning of a criminal statute, a court should apply the rule of lenity and interpret the statute in favor of the accused." *State v. Cole,* 2003 WI 59, ¶ 13, 262 Wis. 2d 167, 663 N.W.2d 700. Additionally, Quintana argues that statutes should be strictly interpreted against the State and in favor of the defendant so as to avoid usurping the function of the legislature and provide the public with fair notice of prohibited conduct. *See State v. Kittilstad,* 231 Wis. 2d 245, 266–68, 603 N.W.2d 732 (1999) (distinguishing between the rule of lenity and the rule that penal statutes are generally construed strictly to safeguard a defendant's rights).

¶ 67. " 'While it is true that criminal laws should be strictly construed, this rule . . . is not to be applied with such unreasonable technicality as to defeat the purpose of all rules of statutory construction, which purpose is to ascertain and enforce the true meaning and intent of the statute.' " 3 Singer, *supra,* § 59.8 (quoting *State v. Bonner,* 190 So. 626, 627 (La. 1939)). The true meaning and intent of the mayhem statute is to punish those who intentionally disable or disfigure another person's bodily member.

¶ 68. To argue that the statute does not provide fair notice highlights the absurdity of Quintana's interpretation. To prohibit someone from mutilating the

nose but allowing intentional mutilation of the fore-head to a degree of severity that it no longer protects the brain is counter-intuitive. A person of ordinary intelligence may ascertain from this statute that the intentional mutilation and disabling of the human body is prohibited under the law. One could reasonably conclude that the forehead, one of the most prominent and critical parts of the body, is included if the nose, lip, and ear are included. The legislature did not use the phrase "other bodily member" in a restrictive sense. Rather, the phrase is meant to cover those parts of the body not historically or specifically enumerated in the statute.

■

¶ 69. Quintana argues that if "member" is defined to include skin and bone, the mayhem statute will be expanded and the only difference between mayhem and aggravated battery or reckless injury will be a greater penalty if the defendant happens to be charged with mayhem.[31] However, mayhem can be distinguished from aggravated battery and other crimes because mayhem is a specific intent crime; namely, the specific intent to disable or disfigure. The penalty for mayhem

---

[31] Mayhem is rarely charged because of the number of other statutes that can be charged in its place. It will likely continue to be rarely charged due to the difficulty in proving a specific intent.

> [M]ayhem has become something of an anachronism in Wisconsin's criminal law, largely superseded by more "modern" crimes. *See, e.g.,* Wis. Stats. § 940.19 (battery and aggravated battery); Wis. Stats. § 940.23 (injury by conduct regardless of life); Wis. Stats. § 940.24 (injury by negligent use of weapons); Wis. Stats. § 941.30 (endangering safety by conduct regardless of life). Thus, prosecutors rarely charge offenders with mayhem any-more. . . .

*Cole v. Young,* 817 F.2d 412, 417 (7th Cir. 1987).

is more severe because mayhem is a cruel and savage crime, and it requires the specific intent to disable or disfigure.[32]

¶ 70. To constitute mayhem, the State must show that the defendant had (1) the specific intent to disable or disfigure; (2) by cutting or mutilating the tongue, eye, ear, nose, lip, limb, or other bodily member; and (3) the cutting or mutilating produced great bodily harm. Wis JI—Criminal 1246.[33]

¶ 71. A specific intent to disable or disfigure is distinguishable from a general intent. A general intent to do the acts and the consciousness of the nature of the acts and possible results differs from the specific intent to do the intended harm, i.e., the specific intent to disable or disfigure. *Kirby v. State,* 86 Wis. 2d 292, 301, 272 N.W.2d 113 (Ct. App. 1978); *State v. Weso,* 60 Wis. 2d 404, 411–12, 210 N.W.2d 442 (1973).

■■

¶ 72. Mayhem requires great bodily harm, although the Jury Instruction Committee has been skeptical of this assertion.[34] The court of appeals in *Kirby* concluded that the "cutting or mutilation, a statutory

[32] By virtue of this specific intent, the penalty for mayhem is much more severe than other assault type crimes. *See generally* 53 Am. Jur. 2d *Mayhem and Related Offenses* § 17 (2006). Mayhem is generally saved for "a cruel and savage crime." *Id.* In Wisconsin, it is a very serious charge; a person guilty of mayhem is guilty of a Class C felony, and thus faces 25 years of imprisonment unlike aggravated battery, which exposes a defendant to up to 10 years of imprisonment.

[33] Although the Jury Instruction Committee's determinations do not carry independent force of law, they are persuasive evidence of what the law is. *State v. Olson,* 175 Wis. 2d 628, 642 n.10, 498 N.W.2d 661 (1993).

[34] The Jury Instruction Committee writes:

element of mayhem, requires an injury that constitutes 'great bodily harm' as interpreted in *La Barge* . . . ."[35]

> The [] element of the instruction, requiring the causing of great bodily harm, was added in 1982 and reflects the holding in *State v. Kirby* [sic] [*Kirby v. State*], 86 Wis. 2d 292, 272 N.W.2d 113 (Ct. App. 1978). *Kirby* held that "causing great bodily harm" was an element of mayhem, even though[] it was not expressly stated in the statute. . . . The Committee revised the instruction in September 1982 to comply with the *Kirby* decision.
>
> In July 1982, the Wisconsin Court of Appeals (District I) decided *State v. Cole* (not published) and held that the 1969 version of Wis JI—Criminal 1230, without "great bodily harm," was a proper statement of the law. Though written by the author of *Kirby*, the *Cole* decision did not mention that case or acknowledge the great bodily harm issue.
>
> On January 27, 1987, the Wisconsin Court of Appeals (District IV) decided *State v. Webie*. . . . *Webie* also noted that "we need not consider whether mayhem continues to incorporate the unexpressed great bodily harm requirement." Though it reversed a previous decision and was recommended for publication, *Webie* was ordered *not* published on April 2, 1987.
>
> In the meantime, Cole (see *State v. Cole,* above) had gone to federal court, claiming that the failure to instruct on an element (great bodily harm) of the crime (mayhem) deprived him of due process. The U.S. Court of Appeals for the 7th Circuit granted habeas corpus relief in *Cole v. Young,* 817 F.2d 412 (7th Cir. 1987). The court reviewed *Kirby, Cole,* and *Webie* and decided that state law made great bodily harm an element of mayhem. That being the case, the court found a constitutional violation in the failure to instruct on that element.
>
> *Since it is the only published opinion, Kirby remains the law of the state. While at least one district of the Wisconsin Court of Appeals disagrees with it, that disagreement did not manifest itself in a published opinion. Thus, Kirby must be followed until it is officially overruled.*

Wis JI—Criminal 1246 Comment (emphasis added).

[35] In *La Barge,* this court concluded that the addition of "or other serious bodily injury" to the end of the great bodily harm statute in 1956 represented a "broadening of the scope of the

*Kirby,* 86 Wis. 2d at 301. The court of appeals reasoned that in the 1957 decision of *State v. Carli,* the "Wisconsin Supreme Court held that mayhem necessarily includes the infliction of great bodily harm."[36] *Id.* at 300; *see also Cole v. Young,* 817 F.2d 412, 416–22 (7th Cir. 1987) (discussing Wisconsin's mayhem statute, *Kirby,* and subsequent developments in Wisconsin mayhem law).

¶ 73. While the Jury Instruction Committee has expressed some concern over the great bodily harm requirement being read into the mayhem statute, the legislature has not acted to correct any possible misinterpretation that arose out of the 1978 *Kirby* decision or its progeny. The inclusion of great bodily harm as an element supports our conclusion that the legislature sought a broad definition of "other bodily member" as great bodily harm is not limited to specific parts of the body. Of course, mayhem's specific intent element to disable or disfigure limits the applicability of the mayhem statute.

statute to include bodily injuries which were serious, although not of the same type or category as those recited in the statute." *La Barge,* 74 Wis. 2d at 331–32. Today, great bodily harm reads:

> "Great bodily harm" means bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury.

Wis. Stat. § 939.22(14).

[36] *State v. Carli,* 2 Wis. 2d 429, 437, 86 N.W.2d 434 (1957) provides:

> In order to prove mayhem, as charged in the first count, the state must prove that [the] defendant acted with malicious intent to maim or disfigure and that he cut or tore off Garber's ear. We are satisfied that the cutting or tearing off of an ear, or even the portion disclosed by the evidence here, constitutes great bodily harm. . . .

¶ 74. We conclude that the forehead qualifies as an "other bodily member" under Wis. Stat. § 940.21, Mayhem, because "other bodily member" encompasses all bodily parts. Because all methods of analysis lead to the conclusion that the legislature intended the phrase "other bodily member" to be construed broadly rather than narrowly, we conclude that the forehead qualifies as an "other bodily member."

## IV. SCHOOL ZONE PENALTY ENHANCER

¶ 75. This court must now determine whether the violent crime in a school zone penalty enhancer[37] is unconstitutional as applied to Quintana. Quintana ar-

---

[37] Wisconsin Stat. § 939.632, Penalties; violent crime in a school zone, provides:

(1) In this section:

(a) "School" means a public, parochial or private school that provides an educational program for one or more grades between grades 1 and 12 and that is commonly known as an elementary school, middle school, junior high school, senior high school or high school.

(b) "School bus" has the meaning given in s. 340.01(56).

(c) "School premises" means any school building, grounds, recreation area or athletic field or any other property owned, used or operated for school administration.

(d) "School zone" means any of the following:

1. On the premises of a school.

2. Within 1,000 feet from the premises of a school.

3. On a school bus or public transportation transporting students to and from a public or private school.

3m. At school bus stops where students are waiting for a school bus or are being dropped off by a school bus.

(e) "Violent crime" means any of the following:

657

gues, under the equal protection and due process clauses of the state and federal constitutions, that the statute creates an irrational and arbitrary classification, and he questions whether school zone laws ever have or ever will protect a single child. The State, however, argues that Quintana fails to meet his burden and show beyond a reasonable doubt that the school zone penalty enhancer is unconstitutional as applied to him. We conclude that Quintana has not met his burden of proof to show that the penalty enhancer is unconstitutional as applied to him. The legislature has determined that safety zones around our schools serve the public interest. An increased penalty for those who commit violent crimes within 1,000 feet of "school premises" is a reasonable approach by the legislature to accomplish this legislative goal. Quintana has failed to show that the penalty enhancer is unconstitutional beyond a reasonable doubt.

1. Any felony under s. 940.01, 940.02, 940.03, 940.05, 940.09(1c), 940.19(2), (4) or (5), 940.21, 940.225(1), (2) or (3), 940.305, 940.31, 941.20, 941.21, 943.02, 943.06, 943.10(2), 943.23(1g), 943.32(2), 948.02(1) or (2), 948.025, 948.03(2)(a) or (c), 948.05, 948.055, 948.07, 948.08, or 948.30(2).

2. The solicitation, conspiracy or attempt, under s. 939.30, 939.31 or 939.32, to commit a Class A felony.

3. Any misdemeanor under s. 940.19(1), 940.225(3m), 940.32(2), 940.42, 940.44, 941.20(1), 941.23, 941.235, 941.24 or 941.38(3).

(2) If a person commits a violent crime in a school zone, the maximum term of imprisonment is increased as follows:

(a) If the violent crime is a felony, the maximum term of imprisonment is increased by 5 years.

(b) If the violent crime is a misdemeanor, the maximum term of imprisonment is increased by 3 months and the place of imprisonment is the county jail.

. . . .

658

¶ 76. This court presumes that Wisconsin statutes are constitutional. *Radke,* 259 Wis. 2d 13, ¶ 11. Moreover, "the heavy burden of overcoming this presumption lies with the person attacking the statute." *Id.* A "party bringing the challenge must show the statute to be unconstitutional beyond a reasonable doubt." *State v. McManus,* 152 Wis. 2d 113, 128–36, 447 N.W.2d 654 (1989) (applying this standard to both facial and as-applied challenges to Wis. Stat. § 346.63(1)(b)); *State v. Matthew A.B.,* 231 Wis. 2d 688, 710, 605 N.W.2d 598 (Ct. App. 1999) (stating "the challenger, [] bears the burden of proving beyond a reasonable doubt that Chapter 980 is unconstitutional as applied to him").

¶ 77. " 'Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.' " *McManus,* 152 Wis. 2d at 129 (citation omitted). A statute must be sustained as constitutional if any reasonable basis for the statute exists. *Radke,* 259 Wis. 2d 13, ¶ 11. "That reasonable basis need not be expressly stated by the legislature; if the court can conceive of facts on which the legislation could reasonably be based, it must uphold the legislation as constitutional." *Id.*

¶ 78. Quintana argues that the school zone penalty enhancer violates the equal protection and due process clauses of the state and federal constitutions. "This court has held the due process and equal protection clauses of the Wisconsin Constitution are the substantial equivalents of their respective clauses in the federal constitution." *McManus,* 152 Wis. 2d at 130. The analysis under both the due process and equal protection clauses is largely the same. *State v. Jor-*

*gensen,* 2003 WI 105, ¶ 32, 264 Wis. 2d 157, 667 N.W.2d 318 (citing *Chapman v. United States,* 500 U.S. 453 (1991)).

¶ 79. The equal protection clause requires that the legislature have reasonable and practical grounds for the classifications that it draws. *McManus,* 152 Wis. 2d at 130. When neither a fundamental right has been interfered with nor a suspect class been disadvantaged as a result of the classification, "the legislative enactment 'must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest.' " *Id.* at 131 (quoting *Frontiero v. Richardson,* 411 U.S. 677, 683 (1973)). Equal protection, however, does not preclude the state from treating persons within its jurisdiction differently so long as the classification it creates has a reasonable basis. *Id.*

¶ 80. Due process bars certain arbitrary, wrongful government actions. *Radke,* 259 Wis. 2d 13, ¶ 12. "Substantive due process forbids a government from exercising 'power without any reasonable justification in the service of a legitimate governmental objective.' " *Id.* (citation omitted).

¶ 81. We conclude that the school zone penalty enhancer is not unconstitutional as applied to Quintana. The legislature has sought to increase the penalty for those who commit violent crimes within 1,000 feet of "school premises." Under Wis. Stat. § 939.632, the crime of mayhem is specifically included in the definition of "Violent Crime." Violent crime also includes a number of other crimes, such as homicide, battery, sexual assault, kidnapping, arson, intimidation of a witness, robbery by

use of a dangerous weapon, child enticement, sexual exploitation of a child, and soliciting a child for prostitution.

¶ 82. Thus, the legislature seeks to deter a broad swath of violent or potentially violent crimes by increasing penalties for those crimes that occur within 1,000 feet of school premises. One possible reason for such a law is to create a safe, or at least safer, zone around our schools where the population of children is likely higher. Achieving safety zones around our schools is a legitimate governmental interest. Children should feel safe at school and, if possible, on their way to school. The legislature seeks a safety zone in order to create a safe haven that children may not have further away from school. Moreover, a safety zone around schools fosters a good learning environment.

¶ 83. The 1,000–foot perimeter is rationally related to the government's interest. One thousand feet is a reasonable distance around schools so as to further the legislature's goal of creating safety zones around our schools. The legislature has clearly concluded that children congregate on or near school premises and are more likely to live near school premises. While one may argue that any number of feet is to some extent arbitrary in that the legislature chose a particular distance, the 1,000–foot perimeter is not patently arbitrary. Moreover, it is rationally related to the government's interest.

¶ 84. Quintana argues that no legitimate reason exists to punish more severely those who commit battery near a school from those who commit battery away from a school. However, the legislature desires not only safe playgrounds, but also safe neighborhoods. As a result, it has attempted to create a safety zone of 1,000 feet, approximately the length of three football fields, around schools. The legislature certainly would not achieve its

goal of a safety zone around schools if the increased penalties applied only to violent crimes on school grounds. The benefits of safe school grounds dissipate substantially when the area surrounding the school is plagued with violent crime. This is true regardless of whether that crime occurs inside or outside the home.

¶ 85. Quintana argues that because the statute has no limitation as to the time of day or a requirement that children actually be present, the public safety goal of the legislation is not achieved. However, the legislature has concluded that a safety zone around schools is desirable, and those advantages do not disappear when the school day is over. It is unreasonable to believe that once the day is over, children cease to benefit from a safety zone around their school.

¶ 86. Furthermore, requiring children to be present when the crime is committed is unworkable and would frustrate the purpose of the statute.[38] Deterring violence can be difficult enough without placing requirements that only serve to confuse the legitimate goals of the statute. The desire to deter violent crime around schools cannot be subjected to an unworkable patchwork of criteria for determining whether the statute should or should not apply based on factors such as: did the violent crime take place within a structure, were weapons used, were children present, or would crime likely spill out into the streets? Any deterrent effect would be eliminated if the law applied only during

[38] It is, however, interesting to note that according to police reports children were found in the house as police officers moved through the house searching for a potential victim. One child, D.O.B. of 01–24–1991, was sleeping in a bedroom; one child, D.O.B. of 08–13–1992, was sleeping on the living room sofa.

school hours or contained other such restrictions. The switch to criminal activity is not so easily turned on and off.

¶ 87. Whether the violence takes place on the streets or in a home within 1,000 feet of school premises is irrelevant to our analysis. The penalty enhancers would certainly be worthless if violent crime in the home was not punished the same as outside the home. There is simply no way to restrain the impact of violent crime to the four walls of the home. The goals of the statute would be crippled if such a distinction were drawn. A reasonable method to deter violent crime near schools is to clearly punish more severely, without variation, violent crime that occurs near schools. We cannot expect to achieve safety zones around our schools if the homes around our schools are filled with violence. The increased penalties further the state's legitimate objective.

¶ 88. Quintana argues that *State v. Hermann*[39] can be distinguished from the case at hand. He argues, as the circuit court concluded, that the rationale for an enhanced penalty changes when a drug crime is not at issue. We do not disagree, but this does not render another rationale unpersuasive or illogical.

¶ 89. In *Hermann,* the court of appeals concluded that enhanced penalties for drug transactions near schools did not violate the equal protection or due process clause. It concluded that drug transactions create a dangerous atmosphere, and thus, deterring those transactions near schools was not patently arbitrary or irrational, and enhanced penalties for drug transactions near schools did bear a reasonable and

[39] *State v. Hermann,* 164 Wis. 2d 269, 474 N.W.2d 906 (Ct. App. 1991).

rational relationship to deterring such activity. The advantages of having fewer drug transactions near schools are similar to the advantages of having less violent crime near schools. Violent crime creates a dangerous atmosphere, so deterring such violent crime near schools is neither patently arbitrary nor irrational. Moreover, the 1,000–foot perimeter for increased penalties bears a reasonable and rational relationship to creating safety zones around schools.

## V. CONCLUSION

¶ 90. Accordingly, the court of appeals' decision is affirmed. We conclude that the forehead qualifies as an "other bodily member" under Wis. Stat. § 940.21, Mayhem. Wisconsin's mayhem statute seeks to punish those who intentionally disable or disfigure another person's bodily member. The manner in which the legislature used the phrase, "other bodily member," requires that we give that phrase a broad construction. If "other bodily member" were to be narrowly construed, the construction would produce absurd results, and the purpose of the statute would easily be defeated. Because the legislature intended the phrase "other bodily member" to be construed broadly rather than narrowly, the phrase "other bodily member" in the mayhem statute encompasses all bodily parts, including a person's forehead. The application of the mayhem statute is limited by the need to prove that a person specifically intended to disable or disfigure.

¶ 91. We further conclude that the violent crime in a school zone penalty enhancer is not unconstitutional as applied to Quintana. The legislature seeks to deter violent crime near schools in an effort to create a safety zone around schools. The 1,000–foot perimeter is a reasonable distance to try to accomplish this legisla-

tive goal. Quintana has failed to show that the penalty enhancer is unconstitutional beyond a reasonable doubt.

*By the Court.*—The decision of the court of appeals is affirmed.